# In the United States Court of Federal Claims

Nos. 06-652C and 06-717C

(Filed Under Seal:  November 21, 2006)
(Reissued for Publication: December 1, 2006)[1]

| | |
|---|---|
| ******************************************** * | |
| * | |
| IDEA INTERNATIONAL, INC.,   * | Post-award Bid Protest; |
| * | Jurisdiction of Federal Supply |
| Plaintiff,   * | Schedule (FSS) Task Order |
| * | Protests; Propriety of Award for |
| v.   * | Non-FSS Services; Inadequate |
| * | Best Value Analysis; Change in |
| THE UNITED STATES,   * | Payment Method After Award; |
| * | Equitable Relief Under 28 U.S.C. |
| Defendant,   * | § 1 4 9 1 ( b ) ( 2 ) ;   P r o p o s a l |
| * | Preparation Costs. |
| and   * | |
| * | |
| ICATT CONSULTING, INC.,   * | |
| * | |
| Defendant-Intervenor.   * | |
| ******************************************** * | |

*Jessica C. Abrahams*, with whom were *C. Stanley Dees*, *Jason N. Workmaster* and *Todd J. Canni*, McKenna Long & Aldridge LLP, Washington, D.C., for Plaintiff.

*Brian T. Edmunds*, with whom were *Peter D. Keisler*, Assistant Attorney General, *David M. Cohen*, Director, and *William F. Ryan*, Assistant Director, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, Washington, D.C., for Defendant.

*Marko W. Kipa*, with whom were *David F. Geneson*, *John W. Chierichella*, *Christopher M. Loveland*, *Aleksander Lamvol*, and *Keith R. Szeliga*, Sheppard Mullin Richter & Hampton LLP, Washington, D.C., for Defendant-Intervenor.

---

[1]  The Court granted the parties 10 days after issuing the decision under seal to submit any proposed redactions of competition-sensitive, proprietary, confidential or other protected information.  The parties have each responded that they have no proposed redactions, and therefore this decision is released for publication in its entirety.

**OPINION AND ORDER**

WHEELER, Judge.

In this bid protest, Plaintiff, IDEA International, Inc. ("IDEA"), is challenging an August 7, 2006 contract award by the Department of Defense Education Activity ("DoDEA") to Defendant-intervenor, ICATT Consulting, Inc. ("ICATT"). The contract is for a Remote Location Home School Program for the dependents of DoD military and civilian personnel located overseas. After contract award, IDEA filed a bid protest at the Government Accountability Office ("GAO") alleging irregularities in the agency's evaluation of proposals and selection of ICATT. DoDEA, believing that IDEA was eligible for an automatic stay of performance following a timely bid protest, issued a Determination and Finding overriding the stay so that ICATT could perform the contract and provide the needed home schooling services. IDEA commenced this judicial action on September 14, 2006 as a challenge to the agency's override of the automatic stay provided in 31 U.S.C. § 3553(d)(3). On October 17, 2006, before the Court had decided the stay override issue, IDEA filed a new action bringing the merits of its GAO protest to this Court. The two actions have been consolidated, although the stay override challenge has been rendered moot by IDEA's election to bring the merits of its protest to the Court.[2]

As grounds for its protest, IDEA asserts in a three-count Complaint that: (1) ICATT was not eligible for award because it did not hold a responsive General Services Administration ("GSA") Schedule 69 contract as required by the Solicitation; (2) DoDEA failed to evaluate the proposals properly pursuant to the stated technical and past performance evaluation criteria, and failed to make a valid best value award determination; and (3) DoDEA unlawfully issued an out-of-scope contract modification materially altering the contract payment provisions shortly after contract award.

Defendant has filed a motion to dismiss Counts II and III of the Complaint on the ground that the Court lacks jurisdiction over a protest challenging a task or delivery order, unless the protest relates to "the scope, period, or maximum value of the contract under which the order is issued." Federal Acquisition Streamlining Act of 1994 ("FASA"), 10 U.S.C. § 2304c(d) and 41 U.S.C. § 253j(d).[3] Defendant also has moved for judgment on the Administrative Record, arguing that ICATT's GSA Schedule 69 contract covers home

---

[2] The statutory stay of performance of a protested contract applies only to timely protests filed at the GAO. See 31 U.S.C. § 3553(a), (d)(3). Plaintiff lost its right to this automatic stay when it brought the merits of its protest to this Court.

[3] Federal Acquisition Streamlining Act of 1994, Pub. L. No. 103-355, 108 Stat. 3243 (codified in scattered sections of 10 U.S.C. and 41 U.S.C.). FASA's task and delivery order provisions are codified identically at 10 U.S.C. §§ 2304a–04d and at 41 U.S.C. §§ 253h–k.

schooling services, that the agency's evaluation and award to ICATT was rational and in accordance with law, and that the contract modification did not materially change the scope of work. ICATT has filed a separate motion to dismiss and motion for judgment on the Administrative Record joining in the Government's arguments, but also providing an analysis of the factors the Court should consider in granting or denying injunctive relief. IDEA has cross-moved for judgment on the Administrative Record. Both IDEA and ICATT have submitted declarations to supplement the Government's Administrative Record.

For the reasons stated below, the Court concludes that it has subject matter jurisdiction to review this protest relating to a task order under a GSA Federal Supply Schedule ("FSS") contract. On the merits, the Court finds that DoDEA's acquisition of home schooling services was less than a model procurement. The selected awardee, ICATT, did not have the capability itself to meet the agency's requirements, so it teamed with a subcontractor, WWIDEA, that did not hold a GSA Schedule contract. A procuring agency may not limit a solicitation to holders of GSA Schedule contracts, and then procure non-Schedule services through the awarded contract. Where, as here, teaming arrangements are made to respond to such a solicitation, all team members must hold GSA Schedule contracts. While the agency should have followed this basic tenet of FSS task order contracting, DoDEA's solicitation did not explicitly inform offerors of the consequences of proposing non-Schedule subcontractors. In a dispute between small businesses, the Court is reluctant to disqualify ICATT where fault most squarely lies with the agency for failing to inform offerors of the applicable rules.

The Court also has difficulty with the agency's "best value" award determination. There is no evidence in the Administrative Record, other than an after-the-fact declaration submitted to the GAO, that the agency's Source Selection Authority ("SSA") gave any consideration to the technical advantages of IDEA's proposal, identified by the Technical Evaluation Board. Instead, the SSA assumed that either offeror could provide the required services, and she chose the lower priced offer without weighing the technical benefits of IDEA against ICATT's slightly lower price. The SSA's award rationale is marginal at best, even under the broad discretion that the Court affords in "best value" determinations.

The agency's payment modification 18 days after contract award also is problematic. The Solicitation indicated to offerors that the agency would pay on a per student basis upon receipt of a proper invoice. The modification changed the basis of payment, instead dividing the contract price into four payment increments without regard to the number of enrolled students. The modification permitted ICATT to receive nearly one-half of the contract price in the first month of the contract. This significant change should have been announced to all offerors responding to the solicitation.

In considering appropriate relief, the Court notes that ICATT has been performing this one-year contract for more than three months, and that DoDEA has paid ICATT $1.6 million.

The Court especially is mindful of the needs of the military families and children, and of the benefits of home schooling program stability.  Although the parties sharply disagree on the extent of disruption that would occur through a mid-year change of contractors, certainly there would be some disruption that could be avoided by continuing the current contract.  Also, some of the teachers who previously worked for IDEA have departed to join the new subcontractor, WWIDEA.  It is not clear that IDEA could immediately step in and provide the same level of services as ICATT and WWIDEA.  Moreover, despite its missteps, DoDEA apparently succeeded in selecting a qualified contractor team at a reasonable price.  Applying 28 U.S.C. § 1491(b)(2), the Court will grant Plaintiff recovery of its proposal preparation costs, but will not require a change in contractors at this stage.

Since there are no option periods to continue this contract beyond one year, DoDEA presumably will conduct another competitive procurement for home schooling services in 2007.[4]  The Court is hopeful that DoDEA will learn from its mistakes in 2006 and conduct a better procurement next year.  A full discussion of the above summary follows.

Factual Background

On May 18, 2006, DoDEA issued its Remote Location Home School Program Solicitation No. HE1254-06-Q-0024 ("the Solicitation") to provide a comprehensive, secular home school program for the dependents of active duty military and DoD civilians located overseas.  Administrative Record ("AR") 15-33.  The program is available to dependents in grades K-12 who are residing in areas not served by a DoD dependents school or for whom a DoDEA school is not nearby.  AR 20.  The program was to serve up to 700 eligible students residing in specified locations outside the United States.[5]  Id.  The contract was to run for 12 months from the date of award.  AR 19, 20.

Under the program, the contractor is to provide "all necessary personnel, oversight, management, materials, equipment and services" for an on-line, home school program.  AR 20.  The contractor's support to eligible families includes:  a choice of grade level curriculum materials, a computer (if needed), free internet access and E-mail account, a multi-function printer, scanner, and copier, technical support to assist with computer problems, video or teleconference training workshops for parents and students, certified teachers familiar with

---

[4]  If there were any option for extending the current 12-month contract, the Court would require that it not be exercised.

[5]  According to the Solicitation, the estimated breakdown of the 700 students was to be 300 from Asia, Australia, and island countries in the Pacific and Indian Oceans, 200 from Europe, Africa, and Asia (to the border of Pakistan and India), and 200 from North, Central and South America, and the Caribbean.  AR 20.

home schooling to assist parents with planning, lesson development, instructional delivery, and testing and assessment activities.  AR 20-21.

DoDEA restricted the procurement to holders of GSA Federal Supply Schedule ("FSS") 69 contracts, covering IT professional services.  AR 15, 29.  The Solicitation indicated that DoDEA would award a firm-fixed price contract by delivery order against the selected offeror's Schedule 69 contract.[6]  AR 29.  DoDEA placed the Solicitation as a request for quotations through the GSA's E-Buy website, a service that facilitates FSS purchases.  See Federal Acquisition Regulation ("FAR") § 8.402(d); AR 34.  DoDEA established a June 16, 2006 due date for the submission of offers.  AR 15.

The Solicitation stated that proposals would be evaluated and a contract awarded "under the Best Value Continuum approach, to the responsible Offeror(s) whose offer is considered most advantageous to the Government, price and other factors considered."  AR 29.  The significant evaluation categories were Technical, Past Performance, and Price.  Id.  The Solicitation stated that "no proposal will receive the award unless the Price of that proposal has been determined to be fair and reasonable."  Id.

Under the "Technical" evaluation factor, the two subfactors were:  Instructional Program and Technical Support.  The Technical subfactors were to be rated Exceptional, Acceptable, or Unacceptable.  AR 29-31.  Under the "Past Performance" evaluation factor, the four subfactors were: Quality of Product or Service, Customer Service, Program Effectiveness, and Overall Satisfaction.  AR 30.  The Past Performance subfactors were to be rated Satisfactory, Neutral, or Not Acceptable.  AR 32.  The Price was to be offered on a per student cost basis on a single contract line item ("CLIN") for "On-line Home School Program Services."  AR 16, 33.  The Solicitation indicated that invoices were to be submitted and paid based upon the number of enrolled students.  AR 18.

IDEA and ICATT submitted proposals to DoDEA on the June 16, 2006 due date.  AR 68, 185.  IDEA had been the incumbent contractor for six years providing home schooling services for students in the Pacific Rim.  AR 69.  ICATT did not have any prior home schooling experience, but it teamed with a subcontractor, World Wide IDEA ("WWIDEA"), started in 2002 by former employees of IDEA.  AR 194-96.  As of the proposal date, WWIDEA had one five-year educational consulting contract with the Idaho Whitepines School District.  AR 205.

ICATT holds a GSA Schedule 69 contract, and it lists Special Item Number ("SIN") 27-500, "Course Development; Administration," among its awarded items.  AR 600.  ICATT's GSA Price List for Course Development and Administration identifies prices per

---

[6]  The term "task order" would have been a better description for a contract to provide services.  The term "delivery order" generally applies to contracts for the delivery of products.

hour ranging from $31.00 to $141.30 for various consultant services, none of which include certified teachers. AR 56-57. The labor categories included in ICATT's Schedule 69 contract are: Principal Consultant, Senior Consultant, Consultant, Trainer/Instructional Designer, Project Manager, Business Analyst, and Research Analyst. Id. For its Geographic Coverage, ICATT identifies the "48 contiguous states including Alaska, Hawaii, and Puerto Rico." AR 57. ICATT's GSA Price List does not contain an all-inclusive price per student for home schooling services. AR 448-67. ICATT's subcontractor, WWIDEA, does not possess a GSA Schedule 69 contract.

IDEA's GSA Schedule 69 contract and its GSA Price List contain prices per student with categories dependant upon the number of students to be enrolled in the program. AR 37, 662. For its Geographic Coverage, IDEA identifies "the 48 contiguous states, Alaska and Hawaii, the District of Columbia, the Commonwealth of Puerto Rico and International areas." Id.

ICATT proposed a price of $4,800 per student, or a total of $3,360,000 based upon 700 students. AR 268. IDEA proposed a price of $4,900 per student, as set forth in its GSA Schedule 69 contract, or a total of $3,430,000 based upon 700 students. AR 184. IDEA's price was 2.08% higher than ICATT's price.

A three-member Technical Evaluation Board ("TEB") evaluated the offerors' technical proposals and past performance information during July 5-12, 2006. AR 374. The TEB scoring summary of the individual evaluators' ratings for the "Instructional Program" and "Technical Support" factors was as follows:[7]

| Offeror | Exceptional | Acceptable | Unacceptable |
|---------|-------------|------------|--------------|
| IDEA | 22 | 28 | 1 |
| ICATT | 14 | 31 | 6 |

AR 275-373. For Past Performance, the TEB evaluated IDEA with 24 "Satisfactory" and 3 "Neutral" ratings, and ICATT with 19 "Satisfactory," 7 "Neutral" and 1 "Not Acceptable" ratings. Id.

---

[7] These ratings are the total scores of the three TEB members based upon their initial review of proposals. The TEB members had not yet met as a group to reach a consensus position. While these scores provide only individual viewpoints, they nevertheless provide insight on how the TEB regarded IDEA as the slightly better technical proposal when both IDEA and ICATT received an overall rating of "Acceptable."

On July 24, 2006, the TEB submitted to the Contracting Officer a summary of the technical and past performance ratings. AR 374-376. The evaluation summary indicated identical consensus ratings for IDEA and ICATT – "Acceptable" for the Instructional Program, "Acceptable" for Technical Support, and "Satisfactory" for Past Performance. AR 374. IDEA and ICATT received identical "Acceptable" Overall Ratings. Id. The concluding paragraph of the TEB's memorandum stated:

> While both offerors were considered to be technically acceptable, IDEA, Inc. clearly provided the most thorough description of services and gave strong evidence of an established program model focusing on the relationship between content standards and home based instruction. Either offeror could perform the requirements of this project, but based upon the raters' evaluations, IDEA, Inc. is the recommended source for this solicitation because they have a slightly stronger proposal.

AR 376.

In a one-page price evaluation, a Contract Specialist compared the offerors' proposed prices with the Independent Government Cost Estimate of $4,200,000 ($6,000 per student), and with selected historical pricing information. AR 377. The Contract Specialist concluded that ICATT's per student price of $4,800 was fair and reasonable, although she erroneously stated that ICATT's price was 5% less that IDEA's price, and that ICATT had offered a "commercial price." Id. In fact, ICATT's price was 2.08% less than IDEA's price, and ICATT's $4,800 per student price could not be regarded as a "commercial price" because it did not originate from ICATT's GSA Schedule contract price list. No correlation exists between ICATT's $4,800 per student price and the hourly consultant rates in ICATT's GSA Schedule contract.

On August 7, 2006, the agency's SSA determined that the award should be made to ICATT based upon its slightly lower price. AR 378-80. The SSA did not address the TEB's recommendation that award be made to IDEA, and did not weigh the technical and past performance evaluations against ICATT's slight price advantage. Id. The SSA recited that both offerors had received "Acceptable" technical evaluations, and "Satisfactory" past performance ratings. Id. DoDEA awarded a contract to ICATT that same day. AR 385-97.

On August 22, 2006, ICATT submitted an invoice for the entire amount of the contract, $3,360,000, without showing any enrollment of students. AR 398-99. Three days later, on August 25, 2006, ICATT's President and the Contracting Officer executed a bilateral modification altering the payment method and schedule under the contract. AR 400-02. Instead of basing the invoices on the number of enrolled students, ICATT and DoDEA changed the process to provide for four new CLINs, and four incremental payments to be

made on August 28, 2006, September 1, 2006, January 1, 2007, and April 1, 2007.  Id.  The new CLINs are described as 0001 – Initial start-up materials ($764,855), 0002 – Initial program instruction ($827,453), 0003 – Balance of program materials ($883,846), and 0004 – Balance of program instruction ($883,846).  AR 401.  Under this new payment method, ICATT received $1,592,308 (47.4%) of the contract price within the first month of the contract, and ICATT ultimately will receive the entire contract price regardless of the number of enrolled students.

History of Proceedings

On August 10, 2006, IDEA (an Alaska-based firm) learned of the contract award through an inquiry to the office of Alaska's Senator Lisa Murkowski.  AR 437-40.  By letter dated August 8, 2006, received by IDEA on August 14, 2006, DoDEA provided a formal notice to IDEA of the award to ICATT.  AR 384.  IDEA received a debriefing from DoDEA on August 22, 2006, and on August 28, 2006, IDEA filed a bid protest with the GAO.  AR 419-40.  On August 29, 2006, believing that IDEA was entitled to an automatic stay of performance under 31 U.S.C. § 3553(d)(3), the agency's Head of the Contracting Activity issued a Determination and Finding that ICATT's continued performance pending the resolution of the protest was in the best interests of the Government.  AR 407-08.  IDEA learned of the agency's stay override by E-mail on September 1, 2006.  The agency's E-mail said that the rationale for the override would be forthcoming.

When IDEA did not receive the agency's stay override rationale during the next two weeks, IDEA filed an action in this Court on September 14, 2006 for declaratory and injunctive relief.  Defendant's counsel provided copies of the stay override determination the following day at a hearing on Plaintiff's request for a temporary restraining order.  After the Court expressed concern that the override determination was inadequate, Defendant's counsel informed IDEA and the Court that the agency would take corrective action.  The Head of the Contracting Activity rescinded the stay override determination on September 15, 2006.  AR 409.  Six days later, however, the agency issued a second override determination allowing ICATT's performance to go forward pending the resolution of IDEA's protest.  AR 411-17.  Plaintiff filed an Amended Complaint challenging the agency's second override decision, and the Court held a second TRO hearing on September 28, 2006.  The Court declined to issue a TRO for reasons stated at the close of the hearing,[8] and requested Defendant to submit a certified Administrative Record under RCFC 52.1(a) leading to a final determination on the merits.

---

[8]  The Court explained that, while "this has not been a perfect procurement," the agency's new override determination "is closer to the mark."  (TRO Hearing, Sept. 28, 2006, Tr. 49).  The Court concluded that "the overriding factor in my mind today is that I don't want the children involved in the program as well as their parents to be in the middle of a tug-of-war involving a business dispute."  Id., Tr. 50.

On October 10, 2006, ICATT's counsel filed a motion to dismiss IDEA's GAO protest. ICATT asserted that this procurement was conducted under FAR Subpart 8.4, "Federal Supply Schedules," that a debriefing is not required in such acquisitions, and that IDEA's bid protest filed more than ten days after IDEA knew or should have known the basis of its protest therefore was untimely. AR 479-82. In similar fashion, Defendant filed a motion to dismiss IDEA's judicial action, arguing that, since there was no requirement for a debriefing in a FAR Subpart 8.4 acquisition, IDEA was not entitled to a statutory stay of performance, and therefore the agency did not need to issue a determination overriding the stay. At that point, IDEA moved the merits of its protest from GAO to this Court. The Court consolidated IDEA's new action (No. 06-717) with IDEA's initial action (No. 06-652). IDEA's challenge to the agency's override determination is now moot, and the remaining issues relate to the merits of IDEA's protest.

On October 23, 2006, Defendant submitted a revised Administrative Record covering the merits of IDEA's bid protest. Following the receipt of briefs on Defendant's and ICATT's motions to dismiss Counts II and III of the Complaint, and on cross-motions for judgment on the Administrative Record, the Court on November 14, 2006 held a hearing on the merits of IDEA's request for declaratory and injunctive relief. The Court has carefully reviewed the entire record and has considered all of the arguments of the parties.

<u>Discussion</u>

I. <u>Subject Matter Jurisdiction</u>

The Tucker Act grants the Court jurisdiction to hear bid protests "in connection with a procurement or proposed procurement." <u>See</u> 28 U.S.C. § 1491(b)(1). To afford relief in bid protest cases, the Court "may award any relief that [it] considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2).

Defendant and intervenor ICATT have moved to dismiss Counts II and III of IDEA's Complaint[9] for lack of subject matter jurisdiction, based upon a prohibition in the Federal Acquisition Streamlining Act of 1994 ("FASA") which provides that "[a] protest is not authorized in connection with the issuance of a task order or delivery order except for a protest on the ground that the order increases the scope, period, or maximum value of the

---

[9] Count II of the Complaint challenges the reasonableness of the agency's evaluation of proposals and "best value" award decision. Count III challenges the modification changing the method of invoicing and payment under ICATT's contract.

contract under which the order is issued." 10 U.S.C. § 2304c(d).[10] However, this provision is not intended to apply to protests relating to the placement of orders under GSA Federal Supply Schedule contracts.

FASA makes clear that "[t]his section [including the prohibition on bid protests] applies to task and delivery order contracts *entered into under sections 2304a and 2304b of this title*." 10 U.S.C. § 2304c(f) (emphasis added). The ICATT and IDEA GSA Schedule contracts at issue here were not entered into under 10 U.S.C. §§ 2304a or 2304b, but pursuant to the authority for GSA's Federal Supply Schedule program that preexisted the enactment of FASA. See 41 U.S.C. § 259(b)(3). FASA itself recognizes that GSA's Federal Supply Schedule program is not affected by FASA, providing that "[n]othing in this section may be construed to limit or expand any authority of the head of an agency or the Administrator of General Services to enter into schedule, multiple award, or task or delivery order contracts under any other provision of law." 10 U.S.C. § 2304a(g). The Federal Supply Schedule program existed long before the passage of FASA in 1994, and the language of section 2304a(g) confirms that Congress intended for the FSS program to remain separate and distinct from the new FASA authority. The provisions of 10 U.S.C. § 2304a(g) demonstrate that Congress understood the difference between GSA Schedule contracts and task or delivery order contracts, but the prohibition on bid protests in 10 U.S.C. § 2304c(d) makes no mention of orders under "schedule contracts."

The distinction between FASA task and delivery order contracts, and GSA Federal Supply Schedule contracts, also is evidenced in the applicable regulations. FAR Subpart 16.5, "Indefinite Delivery Contracts," contains the FASA prohibition on bid protests, stating that "[n]o protest under subpart 33.1 is authorized in connection with the issuance or proposed issuance of an order under a task-order or delivery-order contract, except for a protest on the grounds that the order increases the scope, period, or maximum value of the contract." FAR § 16.505(a)(9). However, echoing FASA's distinction of GSA Federal Supply Schedule contracts, FAR 16.500 states:

> Nothing in this subpart restricts the authority of the General Services Administration (GSA) to enter into schedule, multiple award, or task or delivery order contracts under any other provision of law. Therefore, GSA regulations and the coverage for the Federal Supply Schedule program in subpart 8.4 and part 38 take precedence over this subpart.

---

[10] Identical FASA provisions appear in various sections of both 10 U.S.C., applicable to military agencies, and 41 U.S.C., applicable to other agencies. For ease of reference, the Court will use citations to 10 U.S.C., since this procurement is being conducted by an arm of DoD.

FAR § 16.500(c). The final rule that implemented the original version of FAR § 16.500 (materially the same as the current provision), explained that FSS contracts "were exempt from coverage [by FAR Subpart 16.5] because [FASA] specifically exempted GSA's Federal Supply Schedule Program." 61 Fed. Reg. 39,201-202 (July 26, 1996).

The applicable case law, while not entirely uniform, supports the above statutory and regulatory interpretation. See Labat-Anderson v. United States, 50 Fed. Cl. 99, 104-05 (2001) (FASA prohibition on protests relating to task or delivery orders did not apply to GSA Federal Supply contracts); Severn Cos., Inc., B-275717, 97-1 CPD ¶ 181 (April 28, 1997) (FAR § 16.500 confirms that FASA's restriction on protests was not intended to apply to GSA Federal Supply Contracts). In Severn, the GAO relied on the legislative history of FASA and the implementation of FASA in FAR Subpart 16.5 to find that FASA's prohibition on protests did not apply to Federal Supply Schedule orders:

> . . . we find no evidence that [FASA's] provision [prohibiting protests] is intended to preclude protests with respect to the placement of orders against GSA FSS contracts. In this regard, we note that the legislative history for the provisions of [FASA], which added the above restriction on protests as part of FASA's treatment of task and delivery order contracts, indicates that the order provisions were intended to encourage the use of multiple award order contracts, rather than single award order contracts. H.R. Conf. Rep. No. 103-712, 103[rd] Cong. 2d Sess. 178 (1994), reprinted in 1994 U.S.C.C.A.N. 2607, 2608; S. Rep. No. 103-258, 103[rd] Cong. 2d Sess. 15-16 (1994), reprinted in 1994 U.S.C.C.A.N. 2561, 2575-2576. However, no such incentive was required with respect to the FSS, since it already afforded users a choice of multiple contractors. Further, subpart 16.5 of the Federal Acquisition Regulation (FAR), which includes the restriction on protests, supports the interpretation that restriction was not intended to apply to the FSS since it treats FSS contracts as separate from other indefinite delivery contracts. FAR § 16.500 (FAC 90-41); see 10 U.S.C. § 2304a(g) (1994); 41 U.S.C. § 253h(g) (1994).

Severn, 97-1 CPD ¶ 181, at 2-3 n.1. Since the 1997 decision in Severn, the GAO has accepted jurisdiction of protests relating to task or delivery orders under GSA Federal Supply Schedule contracts. See, e.g., The MIL Corp., B-207508 et al, 2006 CPD ¶ 34 at 3 (Jan. 26, 2006) ("When an agency conducts a formal competition under the FSS program for award of a task order contract, we will review the agency's actions to ensure that the evaluation was reasonable and consistent with the terms of the solicitation."); Crestridge, Inc., B-295424, 2005 CPD ¶ 39 at 2 (Feb. 23, 2005) (Same); Savantage Fin. Servs., Inc., B-292046 et al,

2003 CPD ¶ 113 at 6 (June 11, 2003) (Comptroller General's authority to decide bid protests "includes solicitations and awards of orders under the FSS.").[11]

Defendant relies upon A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 133-35 (2006) and Group Seven Assocs., L.L.C. v. United States, 68 Fed. Cl. 28, 31-32 (2005), but upon careful review, these cases are distinguishable. In A&D, the Court was not presented with an order under a GSA FSS contract, and therefore its holding on jurisdiction is not directly applicable here. In Group Seven, the Court expressed doubt about the Court's jurisdiction in light of the FASA prohibition on bid protests, but ultimately assumed jurisdiction and decided the case on the merits. Group Seven, 68 Fed. Cl. at 32. To the extent that the discussion of jurisdiction in A&D and Group Seven might be regarded as inconsistent with the holding here, the Court finds that Labat-Anderson and Severn are more in line with the cited provisions of FASA and FAR, and that FASA's prohibition on bid protests does not cover GSA Federal Supply Schedule orders. Therefore, the Court possesses subject matter jurisdiction under the Tucker Act to review this protest.

II. Standard of Review

The Court reviews challenges to agency actions in a bid protest according to the standards set forth in the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"). Under this standard, the Court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (incorporated by reference in 28 U.S.C. § 1491(b)(4)). See also Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330 (Fed. Cir. 2001); Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000).

Under the APA standards, "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Impresa Construzioni, 238 F.3d at 1332 (citations omitted). When a challenge is brought on the first ground, the "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" Id. (quoting Saratoga Dev. Corp. v. United States, 21 F.3d 445, 456 (D.C. Cir. 1994). "[T]he courts have recognized that contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." Id. at 1333 (quoting Latecoere Int'l, Inc. v. United States Dept. of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)). "Accordingly, the test for reviewing courts is to determine whether 'the contracting agency

---

[11]   Although GAO decisions are not binding on this Court, the Court "recognizes GAO's longstanding expertise in the bid protest area and accords its decisions due regard." PHT Supply Corp. v. United States, 71 Fed. Cl. 1, 9 n.6 (2006) (quoting Gentex Corp. v. United States, 58 Fed. Cl. 634, 636 n.3 (2003)) (citations omitted).

provided a coherent and reasonable explanation of its exercise of discretion.'" Id. at 1332-33. "When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" Id. at 1333 (quoting Kentron Hawaii, Ltd. v. Warner, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

If a protester demonstrates some degree of success on the merits, the Court must apply the four factors for granting or denying injunctive relief in determining whether to enjoin contract performance.   PGBA, LLC v. United States, 389 F.3d 1219 (Fed. Cir. 2004). "Establishing legal and prejudicial error does not automatically translate into injunctive relief."  Cubic Defense Sys., Inc. v. United States, 45 Fed. Cl. 450, 473 (1999).  To obtain a permanent injunction, Plaintiff must show through a preponderance of the evidence: (1) actual success on the merits; (2) that it will suffer immediate and irreparable injury; (3) that the public interest would be better served by the relief requested; and (4) that the balance of hardships on all the parties favors the protester.  Bannum, Inc. v. United States, 60 Fed. Cl. 718, 730 (2004), aff'd 404 F.3d 1346 (Fed. Cir. 2005); Seattle Security Servs., Inc. v. United States, 45 Fed. Cl. 560, 571 (2000) (citing Delbert Wheeler Constr., Inc. v. United States, 39 Fed. Cl. 239, 251 (1997), aff'd, 155 F.3d 566 (Fed. Cir. 1998)).

### III.  Supplementation of the Administrative Record

IDEA and ICATT have offered declarations to be added to the agency's certified Administrative Record.  IDEA has submitted declarations from its Executive Director, K. Timothy Cline, while ICATT has submitted 11 declarations from various officers and employees of ICATT and WWIDEA, as well as from parents of students enrolled in the Remote Location Home Schooling Program.  ICATT argues in its motion to supplement that its declarations "fill in gaps" in the Administrative Record concerning the irreparable harm to the parents and students that would result from a mid-stream change in educational providers, and that the declarations meet the criteria established in Esch v. Yeutter, 876 F.2d 976, 991 (D.C. Cir. 1989).

The Court finds that the declarations provide useful information on the issue of whether declaratory or injunctive relief should be granted.  The declarants, all from outside the procuring agency, can assist the Court in balancing the respective harms to IDEA, ICATT, and the parents and students enrolled in the program.  The declarations fit at least two of the eight categories outlined in Esch v. Yeutter.  Category (4) allows supplementation when "a case is so complex that a court needs more evidence to enable it to understand the issues clearly," and Category (8) applies "in cases where relief is at issue, especially at the preliminary injunction stage."  876 F.2d at 991.  See also CCL Serv. Co. v. United States, 48 Fed. Cl. 113, 119 (2000) (Supplementation is appropriate where the record "still has lacunae that should be filled based on the protestor's challenges."); GraphicData, LLC v. United States, 37 Fed. Cl. 771, 780 (1997) ("[A] judge confronted with a bid protest case should not

view the administrative record as a[n] immutable boundary that defines the scope of the case.").

The Court therefore will allow the addition of IDEA's and ICATT's declarations to the record, but will resort to them only for the purpose of weighing the respective harms that would result from granting or denying declaratory or injunctive relief. The Court will not consider these declarations for any of the substantive issues raised on the merits in Plaintiff's protest.

IV. ICATT's GSA Schedule 69 Contract

As required by DoDEA's Solicitation, ICATT holds a GSA Schedule 69 contract, listing three Special Item Numbers ("SINs") including SIN 27-500, "Course Development; Test Administration." AR 600. On its GSA Schedule price list, ICATT identifies seven labor categories: Principal Consultant, Senior Consultant, Consultant, Trainer/Instructional Designer, Project Manager, Business Analyst, and Research Analyst. AR 56. The prices per hour for these seven categories range from $67.50 to $141.30. Id. For each labor category, ICATT has provided a description of the services included, none of which includes teaching or home schooling. AR 56-57. Thus, while ICATT lacks experience in the schooling requirements of DoDEA's Statement of Work, it seemingly possesses the project oversight and management skills called for in the Solicitation.

To enhance its proposal with the necessary home schooling component, ICATT teamed with WWIDEA. AR 185. Although the precise breakdown of the work between ICATT and WWIDEA is not evident in their proposal, WWIDEA is prominently described as a team member with ICATT, and the proposal contains approximately equal components describing the skills, personnel, and experience for ICATT and WWIDEA. Id. The problem, however, is that WWIDEA does not possess a GSA Schedule 69 contract.

Although our Court has not addressed the precise issue of whether subcontractors in a Federal Supply Schedule procurement must possess GSA Schedule contracts, the GAO consistently has held that they must. See Altos Fed. Group, Inc., B-294120, 2004 CPD ¶ 172 at 2 (July 28, 2004) (By announcing intention to award to an existing FSS contractor, vendors were on notice from agency that all items were required to be within the scope of the vendor's or its subcontractors' FSS contracts); Information Ventures, Inc., B-293743, 2004 CPD ¶ 97 at 2 (May 20, 2004) (Non-FSS products and services may not be purchased using FSS procedures); Omniplex World Servs. Corp., B-291105, 2002 CPD ¶ 199 at 4 (Nov. 6, 2002) (While a schedule contractor may be permitted to use subcontractors to provide services in its FSS contract, "it may not properly use subcontractors to offer services not included in either its own or those companies' FSS contracts, since this would mean that it was improperly including non-FSS goods or services in an FSS sale."); Pyxis Corp., B-

282469 et al, 99-2 CPD ¶ 18 at 4 (July 15, 1999) (Agency improperly included non-FSS items on delivery orders placed from Schedule contract).

ICATT's price proposal contained an all-inclusive price per enrolled student of $4,800, or a total price of $3,360,000 based upon 700 students. AR 268, 270. However, it is not possible to link this price per student to the hourly labor rates contained in ICATT's GSA Schedule contract. The Court, and the procuring agency, cannot tell how much of the services or the price are attributable to WWIDEA, or which types of ICATT's consultants are included in the price. The only real pricing benchmarks are provided by IDEA's competing GSA Schedule price of $4,900 per student, and by certain historical pricing from other agency contracts. AR 377. There is no evidence that DoDEA ever considered whether WWIDEA held a Schedule contract, or whether the services offered by ICATT and WWIDEA were covered by ICATT's Schedule contract.[12] As Defendant's counsel candidly agreed during the hearing on the merits, ICATT would not have received the contract award without the participation of its home schooling subcontractor, WWIDEA. (Hearing, Nov. 14, 2006, Tr. 59).

Where an agency announces an intention to order from an existing GSA Schedule contractor, it means that "the agency intends to order all items using GSA FSS procedures and that all items are required to be within the scope of the vendor's FSS contract." Tarheel Specialties, Inc., B-298197 et al, 2006 WL 2820577 at *3 (July 17, 2006). Non-FSS products or services may not be purchased using FSS procedures. Instead, the purchase of non-FSS services "requires compliance with the applicable procurement laws and regulations, including those requiring the use of competitive procedures." Id. (citing Omniplex World Servs. Corp., supra.).

While DoDEA should have followed the above rules in purchasing services under the FSS, the Solicitation did not inform prospective offerors that all services including those of subcontractors must be available from a current GSA Schedule contract. The Solicitation's cover page indicated that the competition would be limited to "GSA Schedule 69," AR 15, but the Solicitation did not provide any guidance on whether all services had to be available from a Schedule contract. Paragraph 1.2 of the Solicitation's Evaluation Criteria offered little additional assistance in stating "DoDEA intends to make a firm-fixed price award via delivery order against the responsible offeror's [GSA] Federal Supply Schedule contract for

---

[12] Interestingly, an agency checklist accompanying the Award Rationale, added to Tab 18 of the Administrative Record at the Court's request, does not include any action item to review whether the services offered by the proposed awardee were covered in a GSA Schedule Contract.

IT Professional Services (Schedule Number 69) based upon the evaluation factors below at paragraph B." AR 29.[13]

Without any clear guidance in the Solicitation that an offeror should propose only subcontractors with a GSA Schedule contract, the Court is reluctant to disqualify a small business offeror such as ICATT for WWIDEA's failure to have a Schedule contract. The procuring agency should have been aware of this requirement, and it should have included instructions in the Solicitation.

V.   The Agency's Evaluation and Award Process

The Court is concerned that the agency's SSA did not weigh the benefits of IDEA's slightly superior technical proposal against ICATT's slightly lower price. The Administrative Record shows that the TEB evaluated IDEA and ICATT equally with "Acceptable" ratings for Instructional Program and Technical Support, and with "Satisfactory" ratings for Past Performance. AR 374. Overall, the TEB gave each offeror an "Acceptable" rating. Id. However, the TEB also stated that IDEA "clearly provided the most thorough description of services and gave strong evidence of an established program model focusing on the relationship between content standards and home based instruction." AR 376. The TEB concluded that "[e]ither offeror could perform the requirements of the project," but that IDEA "is the recommended source for this solicitation because they have a slightly stronger proposal." Id. The individual evaluator ratings included in the record support this conclusion. They show higher ratings for IDEA than for ICATT. AR 275-373.

The SSA, however, appears not to have considered the higher technical ratings for IDEA, or the TEB recommendation that IDEA "is the recommended source for this solicitation." AR 376. Instead, the SSA focused on the statement that "[e]ither offeror could perform the requirements of the project," id, and made an award decision based solely on ICATT's slightly lower price. AR 378-80. To the extent the SSA considered the Cost/Price Analysis, the analysis was in error in stating that ICATT's price was 5% lower than IDEA's price. AR 377. Although the SSA probably understood the actual price difference of $100 per enrolled student, or $70,000 based upon 700 students, the percentage difference was just 2.08%.

The Court is mindful that the agency's evaluation and award decision in a best value procurement is an area of wide agency discretion. See Galen Medical Assocs. LLC v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("Additionally, as the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion than if the contract were to be awarded on the basis of cost alone."); Portfolio Disposition Mgmt. Group

---

[13]   It is not readily apparent what "paragraph B" is referencing, as the Solicitation does not contain a "paragraph B" in the cited section of the Solicitation.

LLC v. United States, 64 Fed. Cl. 1, 8 (2005) ("[D]ecisions of the contracting officer, especially in determining 'best value,' are not vulnerable to attack given the level of deference accorded to her determination.").

If the SSA did weigh the benefits of IDEA's slightly higher technical proposal against ICATT's slightly lower price, it is not reflected in her three-page Award Rationale Summary. AR 378-80.  While the SSA is not required to follow the recommendation of the TEB in making an award selection, the Court would expect to see some discussion of her reasoning in the Administrative Record.  The SSA later submitted a declaration to the GAO after IDEA had filed its bid protest, and to be sure, this declaration provides greater clarity of the SSA's analysis and the reasons for her decision.  AR 469-71.  However, a declaration submitted in the course of GAO proceedings carries less weight than if the original Award Rationale Summary had included a more complete explanation.

In light of the Court's ultimate ruling in this case, it is not necessary to decide whether the SSA's decision meets the applicable "arbitrary and capricious" standard.  It is sufficient to say that the decision lacks the full analysis that the Court would expect in a "best value" determination.  The Court acknowledges that this award decision presented two proposals that were quite close both in the technical evaluation and in price, and that reasonable minds may differ on the best choice to be made.  Nevertheless, the Administrative Record ought to contain greater detail supporting the "best value" determination.

VI.  The Agency's Modification Changing the Method of Payment

The Solicitation requested offerors to provide in their proposals an all-inclusive price quotation per enrolled student.  AR 16, 33.  The Solicitation stated that the number of students would not exceed 700.  AR 16, 20.  Under Section I, paragraph C, "Eligibility & Invoice Submission," the Solicitation provided that "[a]fter enrollment of the eligible student, an invoice shall be submitted to the [Contracting Officer's Representative], at the address above, for payment."  AR 18.  This paragraph also stated that "[a]n invoice may contain multiple enrollments," but did not say how frequently invoices could be submitted.  Id.

On August 22, 2006, 15 days after contract award, ICATT submitted an invoice for the entire contract price of $3,360,000.  AR 398.  For its invoice detail, ICATT did not provide any evidence of enrolled students, but simply furnished an estimated breakdown of expenses that would be incurred in performing the contract.  AR 399.  DoDEA did not pay this invoice, but on August 25, 2006, the parties entered into a bilateral modification changing the method of contract payment.  AR 400-02.  Instead of one CLIN for enrolled students, the modification created four CLINs described as "001 - Initial start-up materials," "002 - Initial Program Instruction," "003 - Balance of Program Materials," and "004 - Balance of Program Instruction."  AR 401.  The payment dates for the four CLINs were established as August 28, 2006, September 1, 2006, January 1, 2007, and April 1, 2007.  AR

402.  Under this new payment method, ICATT would receive $1,592,308, or 47.4% of the contract price, within the first month of the contract.

Rather than basing payment on the number of enrolled students, the modification will result in ICATT receiving the full contract price regardless of the number of enrolled students.  While DoDEA and ICATT may rightly anticipate that the expected 700 students will in fact be enrolled, nevertheless the modification caused a material change to the Solicitation's requirements.  Whereas the Solicitation placed the risk of enrolling 700 students on the contractor, ICATT, the modification shifts this risk completely to the Government.  Whether, and how quickly, ICATT enrolls students has no effect on ICATT's right to receive payment.

This Court has held that "the contract awarded must be the one for which the offerors have competed."  Hunt Building Co., Ltd. v. United States, 61 Fed. Cl. 243, 277 (2004) (citing St, Mary's Hosp. and Med. Ctr. of San Francisco, California, B-243061, 91-1 CPD ¶ 597 (June 24, 1991), and Corbetta Constr. Co., 55 Comp. Gen. 201 (1975), 75-2 CPD ¶ 144).  This rule applies with equal force where the agency has used competitive procedures in awarding a task order.  See Marvin J. Perry & Assocs., B-277684 et al, 97-2 CPD ¶ 128 (Nov. 4, 1997).  It hardly bears mentioning that IDEA may well have offered a lower price if it had known that its receipt of contract payments did not depend on the number of enrolled students.

VII.  Factors To Be Considered In Granting Or Denying Injunctive Relief

Plaintiff has demonstrated some degree of success on the merits of its protest, but the Court must further consider the other factors relevant to granting or denying declaratory and injunctive relief: (1) whether Plaintiff will suffer irreparable injury if injunctive relief is not granted; (2) whether the balance of hardships on all the parties favors the Plaintiff; and (3) whether granting the injunction would serve the public interest.  Of these three factors, no single factor is dispositive because "the weakness of the showing regarding one factor may be overborne by the strength of others."  FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993).

A.  Irreparable Harm

It is well settled in this Court that a lost opportunity may constitute irreparable harm entitling Plaintiff to injunctive relief.  PGBA, LLC v. United States, 57 Fed. Cl. 655, 664 (2003).  A loss of potential profits stemming from the lost opportunity, which could not otherwise be recovered from the Government, often is sufficient to constitute irreparable harm.  Cardinal Maint. Servs., Inc. v. United States, 63 Fed. Cl. 98, 110 (2004); United Payors & United Providers Health Servs., Inc. v. United States, 55 Fed. Cl. 323, 333 (2003).  Plaintiff has performed home schooling services for DoDEA for six years, and likely

-18-

expected that its work for this agency would continue.  The size of the contract is relatively modest and extends only for one year, but the Court accepts Plaintiff's assertion that the contract is a significant opportunity for a small business.

The Court also must look to non-economic harms, because some of our decisions have observed that "economic loss alone does not constitute irreparable harm."  Chapman Law Firm Co. v. United States, 67 Fed. Cl. 188, 193 (2005) (citing Zenith Radio Corp. v. United States, 710 F.2d 806, 810 (Fed. Cir. 1983); Spherix, Inc. v. United States, 62 Fed. Cl. 497, 505 (2004)).  In this regard, the record reflects that Plaintiff has lost some of its certified teachers and other employees, but that Plaintiff took this action voluntarily in late August 2006 to reduce its payroll when learning that it had not been selected for award.  See Intervenor's Declarations of Mark Pope, Tonya Brewer, Vicki Acker, Melinda Lewis, and Amanda Hoke.  These terminated employees now work for ICATT, and have expressed reluctance to return to Plaintiff even if the Court were to enjoin further performance of ICATT's contract.  Id.  At least to some extent, the harm Plaintiff complains of occurred because of its own voluntary action.  See Bannum, Inc. v. United States, 56 Fed. Cl. 453, 459 (2003) (discrediting plaintiff's irreparable harm argument because "any harm plaintiff will suffer . . . [was] significantly of its own making.").

The "irreparable harm" factor tilts slightly in favor of Plaintiff because of the lost opportunity to a small business, but not enough to offset consideration of the other factors discussed below.

B.  Balancing the Harms to the Parties

Of paramount importance to the Court are the interests of the military families and children who are receiving education while serving our country abroad.  In one sense, these third parties are not represented in this action, but the Court regards their interests as more important than any of the parties who are represented.  To maintain stability in the education program, the Court will not impose upon military families a second change in home school providers within six months.  The recipients of the home schooling services must have confidence in the continuity of the education process, and confidence in the arm of DoD that is providing these services.[14]  Confidence would not be enhanced through a message to the families abroad that legal and business disputes back home are frustrating their children's education.  For these significant reasons, the home schooling program is best served by allowing the current 12-month contract to be completed.  The entities who desire to compete for this work presumably will have another opportunity in 2007, and with the Court's

---

[14]  Intervenor's counsel rightly noted at the hearing on the merits that, in the daily routines of military families, "the educational process may be one of the few stabilities in their life." (Hearing, Nov. 14, 2006, Tr. 92).

commentary in this decision, the agency may be better equipped to conduct a well-run acquisition.

The Court is not convinced that any reversion to IDEA at this point would in any respect be seamless. Despite the sharp disagreement of the parties, there is some doubt that IDEA has the necessary resources to step in immediately and resume performance. There would be disruption in the student-teacher relationship. New teachers would require time to learn the needs and intricacies of individual families. Constant changing of teachers, regardless of their abilities, would interrupt the quality of education provided. Inevitably, there would be delay in any transition, and a corresponding delay in the expected educational progress of the children. In balancing the harms, the Court's deference to time-sensitive circumstances is well established. See Advanced Sys. Dev., Inc. v. United States, 72 Fed. Cl. 25, 31 (2006); Alion Sci. And Tech. Corp. v. United States, 69 Fed. Cl. 14, 25-26 (2005); Spherix, Inc. v. United States, 62 Fed. Cl. 497, 500 (2004); Dynamics Eng'g Co., Inc. v. United States, 48 Fed. Cl. 614, 620 (2001).

Also, the record reflects a difference in programs, materials and instruction between ICATT and IDEA. ICATT's proprietary software purportedly reduces paperwork, and permits a customized Web-based educational data management system. See Declaration of Jennifer Lutey. This system provides technology-enhanced educational planning, evaluation tools, and a course mastery checklist. Id. IDEA does not use this system, and does not possess a license that would allow it to do so. Id. In contrast, IDEA has employed Microsoft Word version forms that are said to be less interactive and require greater manual input of grade reports and transcripts, and greater paper management. Id. These program differences further underscore the need for continuity with the military families.

The balancing of the harms is decidedly in favor of the military families and therefore Defendant. This factor is not supportive of Plaintiff's request for injunctive relief.

C.   The Public Interest

In any federal acquisition, the public interest is served when government officials follow all applicable procurement rules and regulations. Cardinal Maint. Serv., 63 Fed. Cl. at 111 (granting permanent injunction "will also promote the integrity of the procurement process by holding the government accountable for its actions."); CW Gov't Travel, Inc. v. United States, 61 Fed. Cl. 559, 576 (2004) ("There is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations."). Here, the federal agency does not receive high marks. In particular, the Court does not condone the agency's delay in early September 2006 when it announced by E-mail to Plaintiff that it had issued an override of the automatic stay of performance, but then failed to furnish a copy of the Determination and Finding, AR 407-08, until two weeks later after Plaintiff had filed suit. Moreover, the agency's changes

in position during the course of proceedings to defeat Plaintiff's protest on procedural grounds were regrettable.

The Court also must consider as part of the public interest that DoDEA has paid ICATT nearly $1.6 million under the contract to date. If the Court were to enjoin further performance of ICATT's contract, the agency would need to negotiate a price with IDEA for the remainder of the school year, or conduct an expedited resolicitation, either of which likely would cost the Government significantly more than ICATT's current contract price. By completing the ICATT contract, the Government will realize a savings.

The interests of the military families bear repeating as part of the public interest. The interests of our country are best served when the families abroad are confident of the home schooling services the Government provides. While there are competing interests to be considered, on balance the public interest factor weighs slightly in Defendant's favor.

VIII.  Proposal Preparation Costs

As permitted by our statute granting jurisdiction over bid protests, the Court will allow Plaintiff's recovery of its proposal preparation costs. 28 U.S.C. § 1491(b)(2); see also Gentex Corp. v. United States, 58 Fed. Cl. 634, 656 (2003); Mangi Envtl. Group, Inc. v. United States, 47 Fed. Cl. 10, 20 (2000). The Court will expect the parties to submit a joint stipulation of such costs within 30 days from the date of this decision, after which the Clerk may enter final judgment without further order of the Court. If the parties cannot agree on the amount of Plaintiff's proposal preparation costs, they should advise the Court at their earliest opportunity, and the Court will schedule further proceedings on this issue.

Conclusion

For the reasons set forth above, the Court hereby orders as follows:

1.  Defendant's motion to dismiss Counts II and III of the Complaint for lack of subject matter jurisdiction is denied. Defendant's motion for judgment on the administrative record is granted in part and denied in part.

2.  Defendant-intervenor's motion to dismiss Counts II and III of the Complaint for lack of subject matter jurisdiction is denied. Defendant-intervenor's motion for judgment on the administrative record is granted.

3.  Plaintiff's cross-motion for judgment on the administrative record is granted in part and denied in part. Plaintiff is denied declaratory and injunctive relief, but Plaintiff may recover its reasonable proposal preparation costs.

4.  On or before December 21, 2006, Plaintiff and Defendant shall submit to the Court a joint stipulation regarding Plaintiff's proposal preparation costs, after which the Clerk may enter final judgment without further order of the Court.  If the parties cannot agree on the amount of Plaintiff's proposal preparation costs, the parties shall advise the Court of such disagreement at their earliest opportunity and further proceedings on this issue shall be scheduled.

5.  This Opinion is filed under seal.  On or before December 1, 2006, the parties shall carefully review this unredacted opinion for competition-sensitive, proprietary, confidential or other protected information, and submit to the Court proposed redactions to this opinion, if any, before it is released for publication.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge